# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Harvey Levin,      )
     )
     Plaintiff,      )      Case No. 07 C 4765
     )
     v.      )      Judge Edmond E. Chang
     )
Lisa Madigan, individually, and as      )
Illinois Attorney General;      )
Office of the Illinois Attorney General;      )
State of Illinois;      )
Ann Spillane;      )
Alan Rosen;      )
Roger P. Flahaven; and      )
Deborah Hagan,      )
     )
     Defendants.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Harvey Levin brings an action against the State of Illinois, the Office of the Illinois Attorney General, Lisa Madigan, individually and in her official capacity as Illinois Attorney General, and four senior members of the Office of the Illinois Attorney General in their individual capacities (collectively, "Defendants"), alleging that his employment was terminated on the basis of his age and gender. Levin's complaint sets forth the following claims: age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 (Count 1); sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (Count 2); sex discrimination in violation of the equal protection clause of the Fourteenth Amendment under 42 U.S.C. § 1983 (Count 3); and age discrimination in violation of the equal protection clause of the Fourteenth Amendment

under 42 U.S.C. § 1983 (Count 4). Despite their occasionally overlapping strategies, Defendants split into two groups in defending this lawsuit: (1) Lisa Madigan, in her official capacity as Illinois Attorney General, the Office of the Illinois Attorney General, and the State of Illinois (the "Entity Defendants"); and (2) Lisa Madigan as an individual, Ann Spillane, Alan Rosen, Roger Flahavan, and Deborah Hagan (the "Individual Defendants"). Both sets of defendants move for summary judgment on all of Levin's claims [R. 178, 191]. For the reasons stated below, Defendants' motions for summary judgment are granted in part and denied in part consistent with this opinion.

## I.

## A.

Harvey Levin, a 66-year-old male, began his employment as an Assistant Attorney General in the Office of the Illinois Attorney General (OIAG) on September 5, 2000. R. 183, 199, Defs.' Statement of Facts (DSOF)[1] ¶ 4; R. 228, Pl.'s Statement of Additional Facts (PSOF) ¶¶ 1-2. Levin was 55 years old at the time he was hired by the OIAG. DSOF ¶ 6. He had over thirty years of legal experience, primarily in the insurance defense field. DSOF ¶ 13. Levin was assigned to work in the Consumer Fraud Bureau in Chicago, which is one of the six bureaus within the Consumer Protection Division. DSOF ¶ 10. Assistant Attorneys General in the Consumer Fraud Bureau are generally responsible for investigating consumer complaints, filing cases

---

[1]The Entity Defendants' statement of facts, R. 199, and the Individual Defendants' statement of facts, R. 183, are identical with the exception of paragraph 2, which relates solely to jurisdiction and venue. For convenience, the Court will cite to the Entity Defendants' statement of facts throughout this opinion, unless specified otherwise.

when the investigations reveal that it is appropriate, handling their own litigation case load, and, for more experienced attorneys, participating in multi-state litigation and supervising junior attorneys. DSOF ¶ 11; Defs.' Exhs. R, NN. Because the Consumer Fraud Bureau receives approximately 33,000 complaints annually, AAGs assigned to the Bureau are expected to work productively and efficiently. DSOF ¶ 12. In addition to their litigation responsibilities, AAGs in Consumer Fraud Bureau also educate the public about consumer protection, draft legislative proposals and analyze consumer bills pending in the legislature, and recommend the OIAG's position on the bills. DSOF ¶ 11.

Before he was hired, Levin interviewed with the Deputy Attorney General for Civil Litigation, Roger Flahaven (44 years old), the Chief of the Consumer Protection Division, Patricia Kelly (55 years old), and the Chief of the Consumer Fraud Bureau, Charles "Gil" Fergus (53 years old).[2] DSOF ¶¶ 5, 6-9. Levin's certificate of appointment to the position of Assistant Attorney General is dated September 5, 2000, and was issued by former Illinois Attorney General James E. Ryan . DSOF ¶¶ 4, 77; Defs.' Exh. GG. Levin received a second certificate of appointment when Lisa Madigan replaced James Ryan as the Illinois Attorney General in January 2003. DSOF ¶¶ 41, 76; Defs.' Exh. FF.

On December 1, 2002, Levin was promoted to Senior Assistant Attorney General and received a salary raise. PSOF ¶ 2. He remained in the Consumer Fraud Bureau,

---

[2]Levin admits interviewing with Flahaven and Kelly, but denies that Fergus interviewed him. PSOF ¶ 1.

with Fergus acting as his immediate supervisor for the duration of Levin's employment. PSOF ¶ 33. Nonetheless, the composition of the OIAG changed over the years Levin was employed there. In January 2003, Lisa Madigan was sworn in as the Attorney General for the State of Illinois and designated Ann Spillane as her Chief of Staff. Defs.' Exh. P ¶ 2. In September 2004, Deborah Hagan was selected as the new Chief of the Consumer Protection Division, replacing Patricia Kelly. PSOF ¶ 39; Pl.'s Exh. F at 5:5-9; Defs.' Exhs. U ¶ 4, N ¶ 31. The Chief of Consumer Protection supervises the operation of the Consumer Fraud Bureau. Defs.' Exh. U ¶ 5. Thus, Fergus began reporting directly to Hagan. Defs.' Exh. H ¶ 6. At the time of Levin's firing on May 12, 2006, Hagan reported to Roger Flahaven, the Deputy Attorney General for Civil Litigation. Defs.' Exh. U ¶ 29. Alan Rosen became Flahaven's supervisor after joining the OIAG as Madigan's Chief Deputy Attorney General on December 12, 2005. Defs.' Exh. AA ¶ 7. Rosen reported to Spillane who, in turn, reported to Attorney General Madigan. PSOF ¶ 42.

### B.

Throughout Levin's employment, the OIAG required the job-performance evaluation of new attorneys at least three months and fifteen days before the completion of their first six months of employment, and further evaluations at the completion of their first full year and once per year thereafter. PSOF ¶ 18. The OIAG based its salary raises on these annual, standardized performance evaluations. *Id.* Each non-supervisory employee, including Levin, was evaluated according to twelve categories: (1) preparation; (2) knowledge of law; (3) planning; (4) advocacy skills; (5)

4

communication/negotiation skills; (6) work ethic/productivity; (7) initiative; (8) human relations; (9) judgment; (10) supervisory reporting; (11) professional responsibility; and (12) professional development. PSOF ¶ 19. In each category, attorneys were rated with the numbers 1 (needs improvement), 2 (meets expectations), or 3 (exceeds expectations). PSOF ¶ 19. "Exceeds expectations" meant that the attorney "exceeded overall performance objectives" and the attorney's overall performance was "clearly better than most individuals at this level." Pl.'s Exh. D-2. To achieve an "exceeds expectations" rating, the attorney was "highly skilled in the technical and managerial requirements of the job" and "made exceptional contributions in meeting difficult challenges." *Id.* A rating of 2, or "meets expectations," meant that the attorney "[h]as successfully achieved performance objectives" and "[m]ay have exceeded some objectives, but overall the individual has competently performed the assigned duties." *Id.* This rating also "[d]emonstrates the [attorney's] motivation to improve performance." *Id.* Finally, the lowest rating of "needs improvement" signified that the attorney "[h]as not completely or consistently met performance objectives" and "[h]as not completely reached standards of quality and quantity for performance objectives." *Id.*

During Levin's employment at the OIAG, he was consistently evaluated as "meets expectations" or "exceeds expectations" in each of the twelve categories listed above. PSOF ¶ 20; Pl.'s Exhs. D-2 – D-7. His average scores across these twelve categories for each year of his employment were as follows:

| Year | Average Score |
|------|---------------|
| 2000 | 2.5 |
| 2001 | 2.83 |
| 2002 | 2.83 |
| 2003 | 2.6 |
| 2004 | 2.5 |
| 2005 | 2.5 |

Levin's evaluations were completed by his direct supervisor, Charles Fergus. DSOF ¶ 38. Although Levin's 2004-2005 evaluations were reviewed and signed by Deborah Hagan, and his 2001-2003 evaluations were signed by Patricia Kelly, Fergus states that he completed Levin's evaluations without input from anybody else. *See* Pl.'s Exhs. D-2 – D-7; Defs.' Exh. H ¶ 55. Levin's early evaluations from 2000, 2001, and 2002 contain individual comments about his performance, all of which are positive. *See* Pl.'s Exhs. D-5 – D-7. For instance, in 2002, Fergus described Levin as "a top rate experienced litigator" who was "of great help to all in the Bureau." Pl.'s Exh. D-5. Levin exhibited "outstanding performance on the executive committees of the Firestone . . . multi state cases." *Id.* Similar comments were included on Levin's 2001 written evaluation: "Excellent attorney who is always willing to assist others in the Bureau. Has done an outstanding job on the executive committee for the Bridgestone/Firestone multistate." Pl.'s Exh. D-6. Finally, Levin's 2000 written evaluation, which graded his work during the first four months of employment, stated that Levin was "involved in several serious matters and doing an excellent job." Pl.'s Exh. D-7.

Levin's last evaluation was completed on December 7, 2005 – about five months before his termination. PSOF ¶ 23; Pl.'s Exh. D-2. In that evaluation, Levin was rated as "exceeds expectations" in the following categories: preparation, knowledge of law, advocacy skills, communication/negotiation skills, initiative, and judgment. *Id.* Levin was rated "meets expectations" in all remaining categories: planning, work ethic/productivity, human relations, supervisory reporting, professional responsibility, and professional development. *Id.* Levin did not receive a "needs improvement" rating in any category. PSOF ¶ 24.

In an affidavit submitted in connection with Defendants' motions for summary judgment, Fergus claims that, contrary to Levin's positive employment evaluations, his performance left much to be desired. *See* Defs.' Exh. H. Fergus cites a number of specific incidents in support of his contention that Levin lacked the productivity and judgment expected of a Senior Assistant Attorney General with more than thirty years of legal experience. *Id.* ¶¶ 20-50. Fergus claims that these incidents were addressed with Levin at the time that they occurred, and Fergus therefore omitted these incidents from Levin's annual written evaluations. *Id.* ¶ 52. Fergus explains further that, when completing written evaluations, he tries to focus on the positive aspects of an attorney's performance. *Id.* ¶ 53. According to Fergus, Levin's positive evaluations reflected that Levin "had the necessary legal mechanics." *Id.* ¶ 54. However, Levin's declining average scores indicate that he "was not progressing as he should have been . . . [and] his performance did not meet the requirements of his senior title and his litigation approach did not meet the approach of the Office." *Id.*

**C.**

Defendants contend that there are numerous reasons for their decision to fire Levin. While Levin's written evaluations do not reflect these alleged problems, Defendants claim that Levin's unsatisfactory performance was discussed amongst his supervisors and brought to Levin's attention as well. DSOF ¶ 36.

**1.**

In particular, Defendants allege that Levin's productivity fell below the productivity of other attorneys in the Consumer Fraud Bureau. DSOF ¶ 14. Despite the significance that the OIAG places on resolving cases in the most efficient manner possible, Levin settled only two cases in 2005 – one of which was four years old. DSOF ¶¶ 15-16. Fergus and Hagan claim that Levin's record indicated that he was not resolving cases at the rate expected of him. DSOF ¶ 16. Moreover, from January 1, 2006 through May 12, 2006, Levin had no enforcement activity: he filed no lawsuits, nor did he obtain any settlements, judgments, or "assurances of voluntary compliance." DSOF ¶ 17. Levin disputes this alleged period of inactivity, and points to a lawsuit he filed against Ronald W. Kafka and Father & Sons Contractors, home repair contractors against whom the OIAG had received complaints over many years, on May 2, 2006. Pl.'s Exh. G ¶ 56, G-8; Defs.' Exh. H ¶ 45.

Fergus and Kelly claim that Levin's productivity was hampered by his focus on unnecessary minutia in his cases. DSOF ¶ 18. Additionally, Fergus, Kelly, Hagan, and Flahaven all blame Levin's allegedly low productivity on his excessive socializing in the Office. DSOF ¶ 19. In their affidavits, Fergus, Kelly, and Hagan make identical,

general claims that they personally saw Levin walking around the halls, standing in other attorneys' offices, and standing in the offices of employees who were not in the Bureau on a frequent basis. DSOF ¶ 19. Spillane's affidavit describes similar behavior – specifically, that Levin would come to her office, which was about twenty-eight offices from his own office, or find Spillane in the hallway near her office to chat about matters that were not work related. Exh. P ¶ 19. The OIAG's Director of Attorney Recruitment and Professional Development, Ruta Stropus, also submitted an affidavit detailing how Levin would frequently come to her office – located about nineteen offices from his – to chat. Exh. W ¶ 21. At least one of Levin's co-workers in the Consumer Fraud Bureau confirms these accounts. Assistant Attorney General Katrina Wanzer-Derhake asserts that Levin would frequently come to her office to talk about topics unrelated to work, including his vacations and other personal matters. Defs.' Exh. V ¶ 4. Wanzer-Derhake claims further that when the topic turned to work, Levin would regale her with unwanted war stories about his past cases. *Id.* ¶ 4. She also observed Levin standing in the offices of other attorneys, and there were instances where attorneys complained to Wanzer-Derhake about Levin's frequent social visits. *Id.* ¶¶ 6-7. Fergus, Kelly, and Hagan state that junior attorneys, including Wanzer-Derhake, Steve Mange, and Sarah Alipourian, reported that they were uncomfortable with how much time Levin would spend in their offices. Defs.' Exhs. H ¶¶ 28-30; U ¶¶ 16-18; N ¶¶ 16-17.

Levin denies all of these allegations. *See* Pl.'s Exh. G. He claims that he did not get mired in minutia on his cases, nor did he spend an excessive amount of time socializing with others in the Office. *Id.* ¶¶ 25, 32-33.

**2.**

Defendants also claim that they were not satisfied with the way Levin handled the few cases that were assigned to him. Specifically, Defendants found it problematic that Levin oftentimes took extreme positions in multi-state litigation cases without first discussing the issue with his supervisors. DSOF ¶ 27. Hagan states that she received complaints from Assistant Attorneys General in other states about Levin's insistence that the OIAG would not agree to a certain position or certain terms when, in fact, the OIAG had not made a decision about such positions or terms. Defs.' Exh. U ¶¶ 24-27. Fergus claims that this problem continued, despite his efforts to counsel Levin about the importance of keeping his supervisors informed about all multi-state litigation and refraining from taking positions without the Office's approval. Defs.' Exh. H ¶¶ 38-41.

According to Defendants, Levin required more supervision than should have been necessary for his years of legal experience. *Id.* ¶ 44. For instance, with respect to the home repair contractors lawsuit Levin filed in May 2006, Fergus recounts how Levin struggled to come up with a sufficient complaint. *Id.* ¶ 46. Levin's "drafts were sparse" and Fergus spent a lot of time helping Levin put together the complaint. *Id.* Hagan also claims that she witnessed Levin struggle as an attorney. Defs.' Exh. U ¶ 28. She alleges that Levin mishandled the settlement of a multi-state case involving

Direct TV. *Id.* The OIAG had recently settled a very similar case, yet Levin failed to provide the settlement documents to the multi-state group. *Id.* Hagan was disappointed that Levin overlooked the importance of consistency and did not seem to have a good grasp on the issues in the settlement. *Id.*

Again, Levin denies these allegations. Pl.'s Exh. G ¶¶ 34-38.

**3.**

Defendants also cite various other reasons for their decision to fire Levin. In addition to his low productivity and inferior litigation skills, Defendants allege Levin exercised poor judgment on a number of other occasions. For instance, when a new attorney joined the OIAG in 2004 or 2005, Levin allegedly made an inappropriate comment about Katrina Wanzer-Derhake's fashion and/or shopping habits.[3] Levin admits that he made a comment, but that Wanzer-Derhake told him she was not offended and was proud of her fashion expertise. Pl.'s Exh. G ¶ 30. Levin claims Fergus and Hagan never talked to him about this incident. *Id.* ¶ 31. In contrast, Wanzer-Derhake states that Levin's comment "embarrassed [her] in front of the new attorney and . . . demeaned her professionally." Defs.' Exh. V ¶ 10. After female attorneys complained about the nature of the comment, Fergus and Hagan contend that they spoke to Levin about the comment and he agreed that it was inappropriate. Defs.' Exhs. H ¶ 50, U ¶ 23.

---

[3]The timing of the comment is in dispute. Levin states that "there was a comment about Katrina [Wanzer Derhake's] fashion expertise" when Henry Ford was hired in September 2004. Pl.'s Exh. G ¶ 30. Defendants claim that the comment was made in the fall of 2005, when Christine Nielsen was hired. DSOF ¶ 24; Defs.' Exh. V ¶ 9.

Defendants contend that Levin exhibited poor judgment and human relations skills when he repeatedly approached Alan Rosen, the Chief Deputy Attorney General, outside of the office. Defs.' Exh. AA ¶¶ 8-12. According to Rosen, a man from the OIAG – whom he later identified as Levin (*after* the decision to fire Levin was made) – approached him several times when he was walking home from the Office. *Id.* ¶¶ 8-9. This man would tell lengthy stories about his prior legal experiences and his work and views with respect to the OIAG. *Id.* ¶ 10. Rosen believed the man was over-exaggerating his role with the OIAG, and his narratives were "awkward and reflect[ed] poorly on himself." *Id.* ¶ 11. Rosen states that he would alter his route home from the office to avoid this person. *Id.* After the decision was made to fire Levin, Rosen was one of the attorneys present to inform him of his firing. *Id.* ¶¶ 17-18. At that meeting, Rosen recognized Levin as the person who had approached him several times during his walk home from work. *Id.* ¶ 20. Levin admits only that he and Rosen talked while walking home from work on one occasion. Pl.'s Exh. G ¶ 53.

Defendants point to another example of alleged poor judgment. During his tenure as an Assistant Attorney General in the Consumer Fraud Bureau, Levin and/or his wife filed multiple personal consumer fraud complaints with the Bureau. Defs.' Exh. H ¶ 47; Pl.'s Exh. G ¶¶ 49-50. For example, in March 2003, Levin filed a consumer fraud complaint against his dentist alleging that he was over-billed for some dental work. DSOF ¶ 32; Defs.' Exh. X. The dentist, through his legal counsel, contacted the OIAG regarding Levin's alleged representations that he would use his position in the Consumer Fraud Bureau to prove that the dentist had committed consumer fraud.

DSOF ¶ 33; Defs.' Exh. X. In a memorandum to Patricia Kelly dated March 27, 2003, Levin denied suggesting that the OIAG would act specially on his behalf to prosecute the dentist. Defs.' Exh. X. But he did acknowledge "that [he] should not have ever mentioned [the OIAG] as the basis of [his] experience. It was imprudent and a mistake in judgment." *Id.* Defendants put forth this evidence as demonstrative of their concern with Levin's judgment and ability to appropriately represent the OIAG. *See* R. 180 at 4.

## D.

In early 2006, the OIAG embarked on its annual process of conducting performance reviews of all attorneys in the Office. DSOF ¶ 43. At this point, Ann Spillane had served as Attorney General Madigan's Chief of Staff for three years and felt comfortable enough with her acquired knowledge of the Office and its attorneys to begin having more detailed discussions with the senior staff about attorneys who were potentially underperforming. DSOF ¶ 42; Defs.' Exh. P ¶ 14. In particular, Attorney General Madigan's emphasis on consumer protection issues had prompted Spillane to routinely review and discuss the status of consumer protection cases with Flahaven, Hagan, and Fergus. DSOF ¶ 48. Thus, over time, Spillane learned more about the attorneys in the Consumer Fraud Bureau and their level of performance. DSOF ¶ 48. At the outset of the 2006 review, Alan Rosen, who was new to the Office and participating in the annual performance review process for the first time, suggested that the OIAG take job actions with respect to attorneys that were identified as underperforming. DSOF ¶ 44.

On May 10 or 11, 2006, Spillane determined that Levin was underperforming and decided to terminate his employment. DSOF ¶ 63; Defs.' Exh. M at 41. She based her decision on the information she gathered from Levin's supervisors during the 2006 annual review process, as well as her own personal impressions of Levin. DSOF ¶¶ 62, 64; Defs.' Exh. P ¶ 18; PSOF ¶ 71. Spillane also reviewed a printout of the names, salaries, and last evaluation scores of all attorneys on the OIAG's budget before making her decision. PSOF ¶ 74. This list may also have included the attorneys' law school graduation dates.[4] PSOF ¶ 74; Pl.'s Exh. B at 42. On or before May 12, 2006, Spillane informed Attorney General Madigan that she planned to fire twelve attorneys, and may have shared the names of those attorneys with Madigan. DSOF ¶ 66. On May 12, 2006, Flahaven and Rosen met with Levin and informed him that he had been fired.

## E.

Levin was not the only attorney fired by Defendants in May 2006. There were eleven other attorneys who were also fired for performance issues. PSOF ¶ 60; DSOF ¶ 65. Two of these attorneys were Nicholas Rantis and Stanley Wojciechowski – both of whom worked in the Consumer Fraud Bureau with Levin. And, like Levin, Rantis and Wojciechowski were males over the age of 40 at the time they were terminated. PSOF ¶¶ 27-28. Levin and Rantis were both replaced by female attorneys in their thirties. PSOF ¶¶ 88, 92. Wojciechowski's replacement was a twenty-nine-year-old

---

[4]Copies of this printout no longer exist. *See infra* at 36.

male.  PSOF ¶ 95. Defendants dispute that these new hires "replaced" Levin, Rantis, and Wojciechowski because the new hires did not take over any of the three attorneys' cases or work. Rather, Defendants claim that the term "replaced" refers only to head count.  R. 240, Defs.' Resp. PSOF ¶¶ 88, 92.

## II.

The summary judgment motion was fully briefed on March 9, 2010.  R. 238-39. The district judge previously assigned to this case issued an opinion regarding Defendants' motions to dismiss, R. 33, 36, 58, on March 10, 2010, the day after completion of the briefing on the summary judgment motion. R. 244-45. That opinion resolved some of the issues raised in the parties' summary judgment briefs. For instance, Entity Defendants' motion to dismiss the State of Illinois and Lisa Madigan, in her official capacity, as defendants under Counts 1 and 2 was granted.  R. 245 at 21-22. The Court also dismissed Levin's claim for emotional damages in Counts 1 and 2, as well as any claims Levin had for monetary damages or indemnification from the Entity Defendants under Counts 3 and 4. R. 245 at 23-24. However, the Court found that Levin's claim for injunctive relief against the Entity Defendants in Counts 3 and 4 survived because in the event Levin's employment is reinstated, an injunction requiring Defendants to cease engaging in sex or age discrimination would remedy a harm that he is likely to suffer again. R. 245 at 24-25.

Turning to the Individual Defendants' motion to dismiss, Levin's claims for injunctive relief against the Individual Defendants in Counts 3 and 4 were dismissed because "section 1983 does not permit injunctive relief against state officials sued in

their individual as distinct from their official capacity." *Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587 (7th Cir. 2005). The Court rejected the Individual Defendants' argument that the ADEA provides the exclusive federal remedy for age discrimination, and denied their motion to dismiss Count 4. R. 245 at 12-19. This Court does not disturb these rulings.

However, in addition to addressing the merits of the case, there are two issues the Court will re-visit in the instant summary judgment opinion. First, the Court agrees with the Entity Defendants' position that Levin is not an "employee" covered by Title VII or the ADEA; there is now a fuller record upon which to analyze the argument, and the record shows that Levin is not an "employee" for those purposes.[5] *See* R. 180 at 5-8. Therefore, for the reasons discussed further below, the Court grants Defendants' motion for summary judgment with respect to Counts 1 and 2. Second, the Court finds that the Individual Defendants are not entitled to qualified immunity with respect to the alleged age discrimination in violation of the equal protection clause (Count 4). As explained below, the Defendants' motion for summary judgment is denied as to Levin's § 1983 claims. When the evidence is viewed in the light most favorable to Levin, his claims present genuine issues of material fact that cannot be resolved as a

---

[5]This holding conflicts with the decisions issued by the previously assigned district judge. *See* R. 55, 245. While the previous judge found that Levin's position of Senior Assistant Attorney General was indeed "on the policy making level," he held that the exemption was barred because Levin was not "appointed" by the Illinois Attorney General. R. 55 at 6-9; R. 245 at 7-9. As discussed further below, this Court agrees with the first part of the previous judge's analysis, but concludes – based on additional materials not presented to the previous judge – that Levin was indeed an "appointee" and falls within the exemption to employee status under Title VII and the ADEA.

matter of law on summary judgment. Thus, Counts 3 and 4 survive against Ann Spillane, Alan Rosen, Roger Flahaven, Deborah Hagan, and the Office of the Illinois Attorney General.

## III.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent. Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). The evidence presented at this stage must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrance, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), or it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The court does not assess the credibility of witnesses or weigh evidence, *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), and will not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.

## A.

To bring an action for alleged unlawful employment actions under Title VII and the ADEA, the plaintiff must be an "employee" as that term is defined by those statutes. The relevant sections of both statutes that define the term "employee" read:

> The term 'employee' means an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or any appointee on the policymaking level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f). Title VII and the ADEA thus exclude from their "coverage four types of persons: (1) elected officials; (2) the personal staff of an elected official; (3) appointees on the policymaking level; and (4) 'an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.'" *Opp v. Office of the State's Attorney of Cook Cnty.*, 630 F.3d 616, 619 (7th Cir. 2010). Defendants argue that Levin is situated within the third exception as an appointee on the policymaking level. *See* R. 180 at 5-9. The Court agrees.

The Seventh Circuit's "case law regarding the interpretation of an appointee on the policy making level is well-established. An individual is considered an appointee on the policymaking level if 'the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation.'" *Opp*, 630 F.3d at 619 (quoting *Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir. 1996)).

To determine whether the individual was, in fact, "appointed" to the position, the court looks to statutes that relate to the position. *See Opp*, 630 F.3d at 621-22; *Americanos*, 74 F.3d at 143; *Bervid v. Alvarez*, 647 F. Supp.2d 1006, 1011-12 (N.D. Ill. 2009) (the position of Assistant States Attorney is a "creature of state statute," and that statute provides that plaintiff was both appointed by and accountable to an elected official). However, the Seventh Circuit has not had occasion to define the exact parameters of what it means to be an "appointee" for purposes of the Title VII and ADEA exemptions because in all of the cases before it, the law clearly stated that the plaintiff was appointed by a public official. *See Bervid*, 647 F. Supp.2d at 1010-12.

As noted, *supra* at 16 n.5, the previously assigned judge, using the evidence available to him at the motion to dismiss stage, determined that Levin was not an "*appointee* on the policy making level." R. 55 at 6-9 (emphasis added). Specifically, the Court ruled that Levin "was not appointed by the Attorney General herself, but by the Chief of Consumer Protection with the approval of the Deputy Attorney General for Civil Litigation." R. 55 at 7. The Court interpreted 42 U.S.C. § 2000e(f) and 29 U.S.C. § 630(f) to require that an individual be directly appointed "by an elected official because the language regarding appointees was placed in a statute principally concerned with exempting elected officials." R. 55 at 8 (*quoting O'Neill v. Ind. Comm'n on Pub. Records*, 149 F. Supp.2d 582, 589 (S.D. Ind. 2001)). Thus, the Court concluded that Levin "was 'appointed' by the individuals who hired him, not by the Attorney Generals whose names formally appear on his certificates of appointment." R. 245 at 7-8 (denying Defendants' motion to reconsider the Court's decision, R. 55).

19

In his brief opposing summary judgment, Levin maintains that he was not appointed by the Attorney General, as former Illinois Attorney General James Ryan was not personally involved in the decision to hire or appoint Levin. *See* R. 226 at 24. Defendants re-assert their position, with accompanying evidence, that Levin was appointed by former Attorney General James Ryan on September 5, 2000, as evidenced by the Certificate of Appointment Levin received and the statements he signed acknowledging his appointment. *See* R. 180 at 5-8. Also, for the first time, Defendants point to a provision in the Illinois Administrative Code that states that "[t]he Attorney General appoints Assistant Attorneys General, who are assigned either to the Springfield or the Chicago office . . . Assistants are responsible to a designated chief." R. 180 at 6-7 (citing 2 Ill. Adm. Code § 575.260). Defendants state that they were unaware of this code provision at the time their motion to dismiss was initially briefed, R. 33, or decided, R. 55. *See* R. 180 at 7 n.4.

The Seventh Circuit has not expressly considered whether Assistant Attorneys General in Illinois are "appointed" by the Attorney General, thereby excluding them from Title VII and ADEA coverage. However, in an analogous line of cases, the Seventh Circuit has held that "all Assistant State's Attorneys are appointees on the policymaking level and therefore are not within the coverage of the ADEA." *Opp*, 630 F.3d at 619. In *Opp*, the plaintiffs argued "that they were not 'named' or 'appointed' by the State's Attorney, as they were hired by the State's Attorney's Office instead, and in any case, they were hired as Assistant State's Attorneys before Richard Devine was elected as the Cook County State's Attorney." *Id.* at 621-22. The Court of Appeals

found this argument without merit on all accounts. First, under Illinois law, "Assistant State's Attorneys are to be named by the State's Attorney of the county." *Id.* at 622 (quoting 55 ILCS 5/4-2003)). "This statutory language gives the State's Attorney exclusive authority to appoint Assistant State's Attorneys. This statute makes plain that Assistant State's Attorneys are appointees." *Id.* Moreover, plaintiffs' argument that they were not "chosen by" Richard Devine failed because "[e]ach current Assistant State's Attorney is re-appointed upon the swearing in of each new State's Attorney. The [plaintiffs] were thus appointed by Richard Devine upon his swearing in." *Id.*

Here, Illinois law provides that "[t]he Attorney General appoints Assistant Attorneys General." *See* 2 Ill. Adm. Code § 575.260;[6] *see also People v. Scates*, 914 N.E.2d 243, 245 (Ill. App. Ct. 2009) (section 575.260 "clearly provides for the appointment of Assistant Attorneys General"). Thus, "an Assistant Attorney General is appointed to an office established by statute." *Scates*, 914 N.E.2d at 246 (finding the administrative rule codified at § 575.260 valid because it does not conflict with the Attorney General Act, 15 ILCS 205/0.01 through 7). As an Assistant Attorney General, Levin was accountable to the Attorney General, who, like the State's Attorney, is an elected official. As with Assistant State's Attorneys, Illinois law compels the conclusion that Levin was appointed by the Attorney General. Levin fails to cite any authority

---

[6]Illinois law vests the Attorney General with rule-making authority. *See People v. Scates*, 914 N.E.2d 243, 245 (Ill. App. Ct. 2009) (citing 5 ILCS 100/1-70, 1-90). "The rules made by the Attorney General are promulgated in the Illinois Administrative Code. Like statutes, administrative rules have the force and effect of law and are presumed valid." *Id.* (internal citations omitted).

supporting a different result. Levin argues that he was not "appointed" because former Attorney General James Ryan did not personally choose him for the position, yet the Seventh Circuit has never interpreted the statutory exemption to require such direct involvement. Indeed, as the previously-assigned judge noted, "[t]he Seventh Circuit has not addressed the issue of whether an individual must actually be appointed by an elected official *directly* in order to be an 'appointee on the policy making level.'" R. 55 at 7 (emphasis added). Again using *Opp* as a guide, this Court has no reason to believe that Richard Devine personally interviewed each and every Assistant State's Attorney before officially appointing them to their positions pursuant to Illinois law. Thus, the fact that former Attorney General Ryan did not personally interview or select Levin does not distinguish this case from *Opp*.

Upon being appointed an Assistant Attorney General, Levin held a policymaking position in the Illinois Attorney General's Office. In opposing summary judgment, Levin does not argue that he was not a policymaker as defined in *Americanos*. *See* R.226 at 23-25. That argument was rejected by the previous judge in his opinion denying Defendants' first motion to dismiss. R. 55 at 4-6. The prior judge found that, as a matter of law, Levin occupied a policymaking position because his job description "suggests that [Levin] could potentially influence policy making by providing his supervisors with research and opinions or by appearing on behalf of the Attorney General." R. 55 at 6. This Court agrees that Levin's position as an Assistant Attorney General gave him inherent policymaking authority.

In making this determination, "a court is to examine 'the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office . . . [The Seventh Circuit] emphasize[s] the functions of the office involved, not the officeholder.'" *Opp*, 630 F.3d at 620 (quoting *Tomczak v. City of Chicago*, 765 F.2d 633, 640-41 (7th Cir. 1985)). A plaintiff's "actual duties are irrelevant." *Id.* at 621. In *Americanos*, the Seventh Circuit held that the plaintiff, an Indiana Deputy Attorney General, had the "the direct ability to implement the policies and goals of the AG for the State of Indiana." 74 F.3d at 143. The statutory scheme governing the Office of the Indiana Attorney General "recognized that each DAG may be authorized to 'perform in behalf of . . . the state any and all of the rights, powers or duties now or hereafter conferred by law or laws upon the attorney general.'" *Id.* at 141 (quoting Ind. Code Ann. § 4-6-5-1)). Thus, a DAG in Indiana could potentially be called upon to perform any of the enumerated duties of the AG, such as "prosecuting and defending suits by or against the state and state officers, defending suits against state governmental officials or employees or teachers, advising state agencies, [and] collecting outstanding debts owed to the state." *Id.* The fact that the plaintiff was not the ultimate decision-maker does not discount the "meaningful input into governmental decision-making" he had when advising "his superiors concerning what his research on [issues and questions involving politics and policy making where there is room for principled disagreement] revealed, and what he thought would be the correct course of legal action." *Id.* at 141-42; *see also Opp*, 630 F.3d at 621 (Assistant State's Attorneys do not merely implement policy actions on behalf of the State's Attorney; they carry out policy

23

on behalf of the government, and in doing so have "meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation").

Like the plaintiffs in *Americanos* and *Opp*, Levin could be called upon to perform the duties of the Illinois Attorney General. The Attorney General's duties are numerous and generally include (1) prosecuting all actions and proceedings in favor of the State; (2) defending all actions and proceedings against any State officer, in his official capacity, in any of the courts of this State or the United States; (3) advising the State's Attorneys in matters relating to the duties of their office; (4) investigating alleged violations of the statutes which the Attorney General has a duty to enforce; (5) advising the governor and other State Officers; and (6) giving written opinions upon constitutional or legal questions. *See* 15 ILCS 205/4 (West 2010). Because the Attorney General cannot give personal attention to each duty, "[h]e must, and does, have power to appoint the necessary deputies or assistants to aid in carrying out those duties." *Saxby v. Sonnemann*, 149 N.E. 526, 529 (Ill. 1925). As a representative of the Attorney General, Levin's position meets the standard for policy making positions set forth in *Americanos*. As an appointee to a policy-making position, as a matter of law, Levin is not an "employee" covered by the scope of Title VII or by the ADEA. Summary judgment is entered for Defendants on Counts 1 and 2.

**B.**

**1.**

Levin also brought § 1983 claims parallel to his Title VII and ADEA claims, against the Individual Defendants and the OIAG for age and gender discrimination. The previously-assigned district judge dismissed Levin's § 1983 claim for age discrimination (Count 4) against the Individual Defendants based on the doctrine of qualified immunity. R. 245 at 20. The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). Put another way, the general purpose of qualified immunity is "to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984 )).

In this case, the previous judge held that the Individual Defendants were entitled to qualified immunity – but *not* because it was unclear that the alleged age discrimination was prohibited by the Equal Protection Clause. Indeed, it is clearly established that the Fourteenth Amendment forbids arbitrary age discrimination under a rational basis test. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83-84 (2000). To be sure, this is not an exacting level of scrutiny, and the government may rely on age as a proxy for other characteristics. *Id.* at 88. But despite the relatively

light level of scrutiny, irrational age discrimination is clearly forbidden by the Equal Protection Clause. In light of this clarity, the previous judge did not hold that the contours of equal protection were unclear, as a substantive matter, in applying to the alleged age discrimination.

But the Individual Defendants also argued that the enactment of the ADEA precluded government employees from resorting to § 1983 for an age discrimination claim; in other words, the ADEA is the exclusive remedy for age discrimination claims. The judge rejected that argument (and this Court will not disturb that ruling), R. 245 at 13-19, and held that the ADEA does not preclude a § 1983 suit for age discrimination. The judge went on to hold, however, that because it was unclear whether the ADEA was the exclusive age-discrimination remedy, the Individual Defendants were entitled to qualified immunity, R. 245 at 20.

This Court sought further briefing on the application of the qualified immunity doctrine to *procedural*, rather than substantive, uncertainty. R. 256.[7] When determining whether qualified immunity applies to protect a defendant, the question is whether a reasonable official would have known that the official was violating a clearly established constitutional right, which is a substantive question, not a question concerning whether a particular procedural vehicle (*i.e.*, cause of action) is available.

_____

[7]The Court understands that the law of the case doctrine applies where a case is reassigned to a different judge. *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). But if the issue presented is not presented in "precisely the same way" as it was to the prior judge, then there is less force to the law of the case doctrine, *id.*, and here the previous briefing did not directly address whether the qualified immunity doctrine could ever apply to procedural uncertainty as to the proper cause of action.

*See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("As we have said many times, § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") (quotations and citations omitted). The qualified-immunity analysis, with its focus on whether it was reasonably clear that the official's conduct violated a constitutional right, is a poor fit for determining whether one cause of action or another is the appropriate one upon which to base a lawsuit against that otherwise clearly prohibited conduct. It is especially odd to apply qualified immunity in the context where the procedural uncertainty arises from the fact that Congress created a statutory remedy for age discrimination that is substantively *broader* than the equal protection clause. *See Kimel*, 528 U.S. at 88. Had Congress not enacted the ADEA, then it would be clear, of course, that § 1983 is the procedural vehicle by which to bring an age-discrimination claim, and there would be no occasion to apply qualified immunity (so long as one accepts that irrational age discrimination is a clearly cognizable claim) on the grounds of procedural uncertainty. There would thus be an irony in accepting Defendants' argument: Congress supplied even greater protection, generally speaking,[8] against age discrimination than the Equal Protection Clause, and yet accepting Defendants' argument would result in qualified immunity from § 1983 age-discrimination claims until the controlling Court of Appeals

---

[8]The greater protection does not apply across the board, as demonstrated both by this case (because Plaintiff is not an "employee" protected by the ADEA) and, more broadly, by *Kimel* (because the Supreme Court ultimately concluded that the ADEA was not a valid exercise of § 5 authority to abrogate state sovereign immunity with regard to monetary damages claims).

or the Supreme Court addressed the proper procedural-vehicle issue, if it ever did. Applying qualified immunity in this context is far afield from serving the purpose of the doctrine: to permit officials to reasonably anticipate when their *conduct* violates a constitutional right.

Moreover, in a recent case where the Supreme Court held that a federal statute does not preclude a § 1983 action to bring a constitutional claim (as the previous judge held in this case), the Supreme Court decided and remanded the case without asking whether qualified immunity applies. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) (remanding for evaluation of the merits of the constitutional claim with no hint that qualified immunity was an issue to consider). It is true that the question of qualified immunity did not appear to be presented to the Supreme Court. But it is noteworthy that, when the Supreme Court rejected an argument that a federal statute precluded a § 1983 remedy, there was no mention of qualified immunity, which would have obviated the question of money damages.[9]

Based on the reasons discussed above, the Court concludes that qualified immunity does not apply to the § 1983 age-discrimination claim. As a substantive matter, Levin faces a higher hurdle in proving actionable age discrimination under the Equal Protection Clause than under the ADEA. *Kimel* permits treating a person differently based on age so long as the treatment is based on a legitimate purpose

_____

[9]The Supreme Court (and the lower federal courts) may address the question of qualified immunity rather than addressing the merits of the underlying constitutional claim. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 819-21 (2009).

achieved by a rational means. 528 U.S. at 84. As detailed below, however, Defendants maintain that they did not treat Levin differently on the basis of age. Defendants have instead argued that Levin was fired for reasons other than his age. The record evidence is discussed in the next section.[10]

## 2.

In determining whether Levin's equal protection claim for age discrimination will proceed to trial, the Court again emphasizes that the facts at this stage are viewed in the light most favorable to Levin, and reasonable inferences must be drawn in his favor – for now. To survive summary judgment, a plaintiff alleging an equal protection violation under § 1983 must establish that he has been the victim of intentional discrimination using either the direct or indirect method of proof. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036-38 (7th Cir. 2003). Levin pursues both methods of proof in this case.

## a.

To succeed under the direct method, Levin "must offer either direct evidence that would prove the fact in question – the discriminatory intent – without reliance on inference or presumption, or a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *See Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (internal

---

[10]It is worth noting that even if qualified immunity applied to the § 1983 age-discrimination claim for monetary damages, the claim for injunctive relief would survive; additionally, the sex-discrimination claim also survives, as discussed *infra*.

citations omitted); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1118 (7th Cir. 2009) ("Under the direct method, the inference that the employer acted based on the prohibited animus has to be substantially strong."). Levin relies on the latter approach, and, therefore, may present any of three broad types of circumstantial evidence: (1) evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees over the age of 40, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence showing that the employer systematically treated other, similarly situated employees under 40 years old better; and (3) evidence that Levin suffered an adverse employment action and that the employer's justification is pretextual. *Silverman*, 637 F.3d at 734 (citations omitted). "Whatever circumstantial evidence is offered, however, must 'point directly to a discriminatory reason for the employer's action.'" *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010) (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). Pursuant to the direct method, Levin offers circumstantial evidence of types one and two.[11] The Court considers all of Levin's circumstantial evidence to determine whether, taken collectively, the evidence constructs a "convincing mosaic" that would allow a jury to infer intentional discrimination. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (noting that each type

---

[11]The "third type of evidence is substantially the same as the evidence required to prove discrimination under the indirect method," so the Court addresses Levin's attempt to show pretext later in the opinion, *see infra* at 41-44. *Silverman*, 637 F.3d at 734; *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) (explaining that the "pretext" category of circumstantial evidence under the direct method is substantially the same as the evidence required under the indirect method).

of circumstantial evidence can be used on its own or together with other types of circumstantial evidence to establish discrimination).

Levin's primary argument relies on statistical evidence which he claims shows that Defendants intentionally discriminated against him based on age and gender. Levin argues that the Consumer Protection Division's hiring and promotion statistics show that Defendants prefer to hire and promote young females. R. 226 at 17. Levin claims that Spillane "has hired more than double the number of female attorneys to work in the Consumer Protection Division" since she became Chief of Staff in 2003. PSOF ¶ 44. Specifically, Spillane has hired 23 female attorneys and 10 males, and 31 of the 33 new hires were more than 10 years younger than Levin. PSOF ¶ 44. Defendants argue that Levin's use of statistics is improper. R. 239 at 13-14. For example, they claim that Levin's statistics do not provide any information as to the application pool or other background evidence. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (discussing statistical evidence in a reduction-in-force employment action). Defendants state that any increased hiring in favor of women, or younger attorneys, is due to the fact that the OIAG receives more applications from female attorneys and younger attorneys. At their depositions, Spillane and Hagan testified that they receive more applications from women than men. Defs.' Exhs. M at 222-23, Q at 182-83. The OIAG database also shows that most applicants are recent law school graduates and, thus, the Consumer Protection Division receives more applications from junior attorneys. Defs.' Exh. W ¶¶ 14, 17.

Defendants arguments are well-taken. "Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination." *Radue*, 219 F.2d at 616-17 (quotation omitted). And Levin's failure to show the baseline – the applicant pool – against which the hiring statistics should be measured renders his numbers meaningless. *See Hemsworth v. Quotesmith.com*, 476 F.3d 487, 492 (7th Cir. 2007) (rejecting plaintiff's proposed statistical evidence where it lacked "the necessary context for meaningful comparison"); *Ibarra v. Martin*, 143 F.3d 286, 291 (7th Cir. 1998). Moreover, the fact that Levin, Rantis, and Wojciechowski – all males over the age of 40 – were three of the four attorneys fired from the Consumer Fraud Bureau in May 2006 does not, by itself, constitute circumstantial evidence that Levin was terminated because of his age. Statistical evidence "can only show a relationship between an employer's decisions and the affected employees' traits; [it does] not show causation." *Radue*, 219 F.2d at 616. Additionally, as with the hiring statistics, the Court does not consider these numbers in a vacuum. Levin, Rantis, and Wojciechowski were three of twelve attorneys fired on May 12, 2006. DSOF ¶ 65. Four of the terminated attorneys were under the age of 40, and eight, including Rantis, were "substantially younger" than Levin. *See* Defs.' Exh. CC ¶ 4. Thus, the majority of the attorneys who were fired in May 2006 were substantially younger than Levin. In view of the circumstances, the fact that Levin,

Rantis, and Wojciechowski were fired and later replaced with substantially younger attorneys does not raise a strong suspicion of age discrimination.[12]

Levin attempts to bolster his statistics argument with evidence that substantially younger employees similarly situated to Levin received better treatment from Defendants. R. 226 at 17-18. However, as Defendants point out, "[a]n employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). As the Seventh Circuit instructs, "the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 442 (2008). It "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in . . . performance histories or the nature of the alleged transgressions." *Id.* at 405. Rather, the purpose of the similarly-situated test "is to determine whether there are enough common factors between a plaintiff and a comparator – and a few enough confounding ones – to allow for a

---

[12]Indeed, to be clear, the incompleteness of Levin's statistical analysis renders the evidence of other hirings and firings irrelevant. And even if there were any relevancy to the evidence, so much more additional evidence (dissecting each of the hirings and firings) would be required to avoid misleading the jury that Rule 403 would prevent its admission.

meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007).

Here, Levin argues that he was similarly situated to thirty-five attorneys in the Consumer Protection Division who were "substantially younger" than him as of May 12, 2006, and were not fired by Defendants. PSOF ¶ 80. Levin contends that he was similarly situated to these thirty-five attorneys because they (1) had the ability to and did each other's tasks, (2) shared Deborah Hagan as the division chief, and (3) were subject to the same annual standardized written performance evaluation. PSOF ¶ 80. However, a closer look at Levin's comparison group reveals that these attorneys are not comparable to Levin "in all material respects," thus precluding a meaningful comparison. *See Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007).

First, the Court notes that two of the attorneys included in Levin's proposed group are neither female nor "substantially younger" than Levin, who was 61 years old at the time he was terminated.[13] PSOF ¶ 80. Thus, they are easily removed as potential comparators because they do not fall outside of the relevant protected classes. Also, nearly half of the attorneys remaining in Levin's proposed group were *not* assigned to the Consumer Fraud Bureau in Chicago. *See* Defs.' Resp. to PSOF ¶¶ 80-81. These attorneys are not comparable. The Court agrees with Defendants' argument that the relevant comparable field is the Consumer Fraud Bureau in Chicago. As part of the Consumer Fraud Bureau, Levin reported directly to the Bureau Chief, Charles Fergus.

---

[13]William Reif (male, 52 years old) and Matthew Shapiro (male, 52 years old). PSOF ¶ 80(x) and (cc).

Fergus was Levin's immediate supervisor, and responsible for completing annual written performance evaluations for Levin and the other attorneys in the Chicago office of the Consumer Fraud Bureau. The fact that the various bureaus within the Consumer Protection Division used the same performance evaluation forms does not mean that they were subject to the same standards or answered to the same supervisor. *See Bio v. Federal Express*, 424 F.3d 593, 597 (7th Cir. 2005). Levin fails to explain why it is appropriate to compare him to attorneys in other Bureaus such as Charitable Trusts, Franchise, Health Care, or Veterans Rights.

Levin also ignores the different titles and levels of responsibility occupied by attorneys in the Consumer Protection Division. He claims that the title of "senior or supervising attorney" has nothing to do with that attorney's job duties, performance standards, or salary. PSOF ¶ 87. However, he has not produced any evidence, other than his own affidavit attesting to his own limited personal knowledge, that this is the case in the Consumer Protection Division. On the other hand, Defendants have shown that the OIAG's various attorney classifications do require different duties, responsibilities, and qualifications. *See* Defs.' Exh. NN. As a Senior Assistant Attorney General, Levin was expected to "independently make prosecutorial and other litigation decisions . . . The position requires . . . experience in the practice of law and in trial of appellate work along with approximately 10 years experience in the Attorney General's office as an Assistant Attorney General, or comparable experience in the practice of law." Defs.' Exh. NN. In contrast, Class 1 Assistant Attorneys General do not make independent litigation decisions, and must only have graduated from an accredited law

school to be qualified. *Id.* Thus, the Court concludes that Levin is only comparable to other Senior Assistant Attorneys General.

Placing the aforementioned boundaries on Levin's proposed comparator pool results in one sufficient comparator: Joan Matlack.[14] *See* PSOF ¶ 80(s). Matlack, a female, was 49-years old when Levin was fired. *Id.* She was a Senior Assistant Attorney General in the Consumer Fraud Bureau in Chicago. Matlack's 2005 performance evaluation average score was similar to Levin's, yet she was not fired in May 2006. Nonetheless, for purposes of the direct method of proof, the fact that one similarly situated employee received better treatment does not create a reasonable inference that Defendants fired Levin because of his age.[15]

Finally, Levin contends that Defendants' destruction of relevant documents also supports an inference of discriminatory intent. However, as with his other proffered circumstantial evidence, Levin fails to make any connection between this supposed wrong and discriminatory animus. Levin has offered no evidence, other than his own speculation, that Spillane, Flahaven, and Rosen intentionally destroyed documents to hide discriminatory information. The parties briefed this issue during the discovery phase after Levin filed a motion for sanctions. R. 151. The magistrate judge denied Levin's motion and found that the documents were not discarded in bad faith. *See* R.

---

[14]Defendants concede that Matlack was similarly situated to Levin. Defs.' Resp. PSOF ¶ 80(s).

[15]However, the presence of a sufficient comparator, along with three other necessary requirements, permits Levin to make a prima facie case of age and sex discrimination under the indirect method. *See infra* at 37-40, 46-48.

214. Levin fails to present the Court with any new evidence that Defendants acted in bad faith, and the Court declines Levin's invitation to draw any adverse influences from the destruction of those documents. In short, Levin's direct-method evidence does not show that the "real reason" he was fired was based on age. *See Van Antwerp*, 627 F.3d at 299; *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 851-52 (7th Cir. 2010).

### b.

But Levin argues that he has sufficient evidence to show age discrimination using the indirect method. Under the indirect method, a plaintiff must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not over forty. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009). Defendants contend that Levin has failed to establish a prima facie case of discrimination under the indirect method of proof.

With regard to the first and third requirements, it is undisputed that Levin was 61 years old at the time he was fired, and that his termination constituted an "adverse employment action" for the purposes of his prima facie case. Next, "[i]n contexts such as this, where a single employee is let go and another individual is hired instead, the fourth requirement means showing that the discharged worker was replaced with someone substantially younger." *Hoffman v. Primedia Special Interest Publ'ns*, 217 F.3d 522, 524 (7th Cir. 2000); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517

U.S. 308, 313 (1996) (in the age-discrimination context, the replacement of the plaintiff by someone substantially younger is a "reliable indicator of age discrimination"); *Olson v. N. FS, Inc.*, 387 F.3d 632, 635-36 (7th Cir. 2004) (fourth prong of *McDonnell Douglas* need not be rigidly applied in age discrimination claims; it is sufficient for plaintiff to prove he was replaced with a person "substantially younger"). The Seventh Circuit has defined "substantially younger" as generally ten years younger. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003).

Levin argues that he was replaced by 33-year old Junko Minami, thereby satisfying the fourth element of his prima facie case. PSOF ¶¶ 88-89. He points to the personnel transaction request produced by Defendants stating that "Ms. Minami will begin employment as an Assistant Attorney General in the Consumer Fraud Bureau effective September 1, 2006. She will replace Harvey Levin." Pl.'s Exh. D-16. However, Defendants deny that Minami actually replaced Levin. Defs.' Resp. PSOF ¶ 89. They contend that Minami did not take over any of Levin's work, and the term "replaced" only refers to head count. *Id.* Defendants' undisputed evidence shows that all of Levin's cases were indeed reassigned to a number of other attorneys in the Consumer Fraud Bureau. Defs.' Exh. OO ¶ 2. At her deposition, Minami testified that she has never been assigned a file handled by Levin. Defs.' Exh. PP at 55. Thus, Defendants argue that Levin's job responsibilities were absorbed by several attorneys – not by a single person as Levin contends.

The parties do not provide the Court with any legal authority regarding what constitutes a "replacement" under prong four of the *McDonnell Douglas* test. In "mini-

RIF" (reduction in force) cases, the Seventh Circuit interprets an employee's "replacement" to mean the person who absorbed the discharged employee's duties. *See Michas v. Health Cost Controls of Ill.*, 209 F.3d 687, 693 (7th Cir. 2000). However, in mini-RIF cases, a single employee is discharged and his position is not filled. Here, Levin has presented some evidence showing that Defendants hired someone substantially younger to replace him. In any event, Levin satisfies the fourth element by showing that at least one similarly-situated employee outside of his protected class was treated favorably. *See supra* at 36. At 49 years old, Joan Matlack was "substantially younger" than Levin at the time he was fired. *See Humphries*, 474 F.3d at 406-07 (7th Cir. 2007) (a single comparator will do); *Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995) ("The prima facie case, and specifically its fourth prong, are meant to identify situations where the actions taken by the employer, . . . if unexplained, are more likely than not based on consideration of impermissible factors."). Levin has satisfied the fourth element of his prima facie case.

Before the burden will shift to Defendants, however, Levin must also satisfy the second element and show that he reasonably performed to his employer's expectations. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 472-73 (7th Cir. 2002). This is the heart of the dispute between the parties. Here, Levin relies on his written performance evaluations from 2000 through 2005. These evaluations do rate Levin's work as meeting, and in some categories even exceeding, his employer's expectations. Levin also points out that his supervisors continued to entrust him with difficult and complex cases up until the time he was terminated. R. 266 at 4. Taken together, the evidence

Levin presents raises a genuine issue of material fact as to whether Levin was performing his job satisfactorily.

Because Levin has established a prima facie case of age discrimination, Defendants have the burden of articulating a legitimate, nondiscriminatory[16] reason for firing Levin. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742 (7th Cir. 1999). Defendants have articulated several legitimate, nondiscriminatory reasons for terminating Levin's employment. As already discussed, *supra* at 8-13, Defendants state that Levin was terminated because his "work ethic, productivity, performance, judgment, and human relations were not satisfactory for a lawyer of his experience and length of time with the Consumer Fraud Bureau." R. 180 at 10 (citing DSOF ¶¶ 62, 64). Defendants point to Levin's low enforcement numbers and his failure to move cases along efficiently. DSOF ¶¶ 14, 16. Defendants state that they questioned Levin's judgment based on the inappropriate comments he made during office meetings and the fact that he filed three or four consumer fraud complaints with the OIAG on behalf of himself or his wife. DSOF ¶¶ 24-25, 32-35. These reasons are facially legitimate, and the burden reverts to Levin to show that they are a pretext for age discrimination. *Johnson*, 170 F.3d at 742.

As the Seventh Circuit has noted many times, "when an employer has cited performance issues as the justification for its adverse action, the performance element

---

[16]As noted above, in defending against an Equal Protection Clause claim, Defendants could have argued that Levin was indeed treated differently based on age, but for a rational reason; instead, however, Defendants argue that, as a factual matter, Levin was not fired due to age.

of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct." *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008). Indeed, in this case, Levin argues that his positive performance evaluations not only satisfy his obligation to show that he met Defendants' "legitimate job expectations" but they also show that Defendants' reasons for discharging him were pretextual. R. 226 at 1-2. "To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake . . . . Instead, the plaintiff must demonstrate the employer's reason is unworthy of belief." *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002); *see Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (pretext means an explanation that is dishonest); *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather it addresses the issue of whether the employer honestly believes in the reasons it offers."). Levin can demonstrate pretext by creating a genuine issue of material fact as to whether the proffered reasons are: (1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the discharge (insufficient in the sense that a reasonable jury could conclude that the reasons were not the actual basis for the firing). *See Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).

Levin manages to create a dispute of material fact when he contests the specific facts of what Defendants assert is a long history of critiquing and warning Levin about

problems and complaints with his performance, judgment, and human relations skills. Although Defendants claim a history of concern with Levin's job performance, Levin claims that he was unaware of any problems with his work until May 12, 2006, when he was fired. Levin thus argues that Defendants' reasons were manufactured post-hoc to justify the termination. He disputes many of the facts that Defendants claim make up a long history of evaluating and critiquing Levin before his termination. Levin's supervisors testify to a series of meetings with Levin over the years in which they communicated with Levin about his deficiencies. Levin either disputes that these meetings took place or disputes that the subject matter of these meetings included any criticisms of his performance. The fact that a good deal of Levin's evidence on this issue is exclusively his own testimony raises an issue for trial, not summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) ("We have routinely found that a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion."). Levin is not required to show that Defendants' asserted reasoning is not true; he is required to show that it is not the actual reasoning underlying his termination. *See Emmen v. Coca-Cola Bottling Co.*, 95 F.3d 627, 634 (7th Cir. 1996).

In addition to his own testimony, Levin has presented affirmative, objective evidence that his performance was satisfactory. Levin argues that his positive written performance evaluations refute Defendants' belief that he was not meeting their expectations. For instance, Levin's 2005 evaluation, which was completed five months before he was fired, states that Levin's "initiative" and "judgment" exceeded his

employer's expectations. These reviews, among others, stand in stark contrast to Defendants' view of his performance at the time of his termination in early 2006. For instance, exceeding expectations for the "initiative" requirement meant that Levin was "[s]elf-reliant, independent, resourceful and willing to perform above and beyond the requirements of the job" and frequently contributed to the professional growth of others. *See* Pl.'s Exh. D-2. Levin's 2005 evaluation does not hint at any problems with his allegedly questionable human relations skills, and his score in this category demonstrates that Levin "[e]stablish[ed] and maintain[ed] appropriate rapport with other employees, clients, counsel, witnesses and the public." *Id.* Defendants contend that Charles Fergus was the only supervisor responsible for completing Levin's written evaluations and, thus, his views cannot be imputed to others in the chain of command. However, even if Defendants' criticisms of Levin's work and behavior are correct, Levin has raised a trial question as to whether these criticisms were the reasons for his termination to the exclusion of his age. In short, a jury must determine whether or not Levin's performance was satisfactory.

Also, Levin has demonstrated that at least one of Defendants' proffered reasons for firing him lacks a solid factual foundation. Specifically, Spillane claims that she based her decision to fire Levin, in part, on his distasteful interactions with Rosen outside of the office. However, as Levin points out, Rosen testified that he did not know, before the firing decision was made, that the man following him home from work was Levin. Rosen stated that he learned it was Levin on May 12, 2006 – after Spillane had already decided to fire Levin. Thus, Rosen's affidavit refutes Spillane's testimony

on this issue, as it was impossible for Rosen to report the negative encounters to Spillane before she decided to fire Levin.

To survive summary judgment, Levin must cast doubt on each of Defendants' justifications for terminating him; summary judgment is only appropriate when no reasonable factfinder could find that Defendants lied about the reasons it terminated Levin. *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 726 (7th Cir. 2005); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 920 (7th Cir. 1996) (plaintiff must raise issue of fact regarding each of the reasons proffered for his dismissal or suffer the affirmance of the district court's grant of summary judgment). Here, Levin has presented evidence from which a reasonable jury could find that Defendants constructed a basis for terminating Levin and that the true reason for firing him was discriminatory. Levin's performance evaluations and the refutation of the Rosen interaction as a basis for firing Levin call each of Defendants' proffered reasons into question. Accordingly, Levin has established a genuine issue of material fact as to pretext, and he is entitled to a jury determination of his age discrimination claim. Defendants' motion for summary judgment on Count 4 is denied.

## C.

Turning to Levin's sex discrimination claim under § 1983, as with Title VII claims, a plaintiff may prove an equal protection violation using either the direct or indirect method of establishing discriminatory intent. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006) (the analysis is the same for a claim under Title VII and a claim under § 1983; the only difference between the claims is who

can be named as a defendant); *Riordan v. Kempiners*, 831 F.2d 690, 695-96 (7th Cir. 1987) (claim of intentional discrimination under the equal protection clause is subject to the same methods of proof as an analogous claim under Title VII). Again, Levin pursues both methods of proof.

**a.**

Under the direct method, Levin relies on the same circumstantial evidence used to support his age discrimination claim. Again, taken individually and collectively, the Court finds that his arguments do not "point directly" to discriminatory reasons for Defendants' action. Thus, Levin cannot proceed with his sex discrimination claim under the direct method of proof. *See Atanus v. Perry*, 550 F.3d 662, 671 (7th Cir. 2008).

Levin's statistics and document-destruction arguments fail for the reasons already discussed. Again, the Court rejects Levin's argument that Defendants' decision to terminate him, Rantis, and Wojciechowski raises an inference of discriminatory intent. Almost half of the attorneys terminated in May 2006 were females. *See* Defs.' Exh. CC ¶ 4. Also, without repeating the entire analysis, the Court finds that, as with the age claim, the fact that there was one similarly situated, substantially younger female attorney who was not terminated in May 2006 is not enough for Levin to proceed under the direct method. However, this issue will be taken up further below, as it is also a required element of Levin's case under the indirect method. *See Hemsworth*, 476 F.3d at 490-91 (explaining that the indirect method "involves a subset

of circumstantial evidence (including disparate treatment of similarly situated employees) that conforms to the prescription of [*McDonnell Douglas*]").

### b.

Under the indirect method of proof, Levin must establish a prima facie case of sex discrimination by producing competent evidence that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was performing his job satisfactorily, and (4) a similarly situated individual outside his protected class was treated more favorably. *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 906-07 (7th Cir. 2010). "In reverse discrimination cases such as this one, [the Seventh Circuit has] replaced the first element with a requirement that the plaintiff show 'background circumstances' suggesting that the employer discriminates against the majority." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (citing *Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009)) (male plaintiff alleging gender discrimination must set out background circumstances that show that the employer discriminates against the majority, or that there is something "fishy" going on).

It is undisputed that Levin suffered an adverse employment action, and the Court has already determined that Levin has presented sufficient evidence that he was performing his job satisfactorily. Thus, only the first and fourth elements remain at issue. First, Defendants argue that because Levin is a male claiming sex discrimination, the Court must initially consider whether he satisfied the modified *McDonnell Douglas* test. R. 185 at 10-11. Indeed, the Seventh Circuit "has recognized that discrimination by employers against white men is a less common phenomenon

than discrimination against minorities. For that reason, in order to gain the substantial benefits conferred by the use of the *McDonnell Douglas* test, the non-minority plaintiff must be able to plead facts to show why it is likely in this case, that an employer had engaged in such unusual behavior." *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003) (citing *Mills v. Health Care Serv. Corp.*, 717 F.3d 450, 456-57 (7th Cir. 1999)).

Levin argues that he has satisfied the modified *McDonnell Douglas* standard. R. 226 at 22. Specifically, Levin points to the undisputed fact that Spillane, his female superior, made the decision to terminate him, as well as the decision to hire a female to fill the vacant position. He also points to the same hiring and promotion statistics the Court has already deemed unreliable. *See supra* at 31-32. Levin claims these facts are enough to demonstrate the necessary "background circumstances" because, according to Levin, "[i]t is not surprising when women discriminate in favor of women." *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005). Levin contends that his case is analogous to *Hague v. Thompson Distributing Co.*, 436 F.3d 816, 822 (7th Cir. 2006), where the white plaintiffs were able to satisfy the modified *McDonnell Douglas* test in a reverse race discrimination case by presenting "evidence that their black boss fired them and replaced three of them with black employees, the fourth plaintiff's job was assumed by a black employee, and the fifth was not replaced." Although the record in this case does not specify the gender of each person hired to replace each of the male attorneys who were terminated in May 2006, Levin has offered evidence showing that females were hired to fill the vacancies left by two of the three males Spillane fired

47

from the Consumer Fraud Bureau. Taking the facts in a light most favorable to Levin and drawing all reasonable inferences in his favor, the Court finds that he has shown the necessary "background circumstances" to establish the first element of a prima facie case. *See Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

Regarding the fourth prong, Levin argues that he was treated less favorably than similarly situated individuals who were female. He identifies one similarly situated female employee who was not terminated: Joan Matlack. For the reasons discussed above, the Court agrees that Matlack is an adequate comparator and Levin establishes a prima facie case under the indirect method. *See Humphries*, 474 F.3d at 406-07 (7th Cir. 2007) (a single comparator will do); *Collier*, 66 F.3d at 890 ("The prima facie case, and specifically its fourth prong, are meant to identify situations where the actions taken by the employer, . . . if unexplained, are more likely than not based on consideration of impermissible factors.").

The burden-shifting analysis applied to Levin's age discrimination claim carries equal force here. Defendants have come forward with legitimate, non-discriminatory reasons for Levin's discharge, thereby shifting the burden back to Levin to prove that these reasons are not honest. As with his age discrimination claim, Levin's positive performance evaluations are evidence sufficient to support an inference that Defendants did not honestly believe that his performance was deficient. Although Defendants claim to have relied on other incidents outside of the formal, written evaluations in making the decision, Levin disputes Defendants' characterization of

these incidents or that they even occurred. Because Levin creates a dispute of material fact over whether Defendants' concerns with his performance were a pretext for discrimination, Defendants' motion for summary judgment is denied as to Count 3.

## D.

Having determined that Levin established a prima facie case of age and sex discrimination, the Court's next inquiry is whether the Individual Defendants are subject to liability for the allegedly discriminatory action. "To survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant 'caused or participated in [the] constitutional deprivation.'" *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011); *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). For supervisors,

> [a]n official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

*Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Here, it is undisputed that Spillane made the decision to terminate Levin's employment. DSOF ¶ 63. Defendants also admit that Flahaven, Rosen, and Hagan contributed to the 2006 performance review and concurred that Levin should be terminated. DSOF ¶¶ 44-46, 58-60, 62. Flahaven and Rosen met with Levin to inform him of his termination. Defs.' Resp. PSOF ¶ 70. Thus, the Court finds that Levin has

presented sufficient evidence to create a causal link between the alleged constitutional violation and Spillane, Flahaven, Rosen, and Hagan.

Levin also claims that Attorney General Madigan was personally involved in Spillane's decision to fire him. R. 226 at 29. However, the only evidence in the record is that Madigan approved an overall approach and plan for the detailed review of attorney performance, and then conferred with Spillane once the termination decisions had been made. DSOF ¶¶ 45, 66. Attorney General Madigan does not recall whether Spillane told her the names of the attorneys being terminated. Defs.' Exh. CC ¶ 3(f). Levin fails to present any evidence that Madigan had knowledge of facts that would cause her to believe that Spillane was about to make an illegal decision but failed to use her authority to stop the violation. The record, even when read in the light most favorable to Levin, does not support a conclusion that Madigan had knowledge that an unlawful termination was imminent. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003) (supervisors are not automatically liable under § 1983 for subordinates' constitutional torts). Therefore, summary judgment is entered in favor of Attorney General Madigan in her individual capacity.[17]

---

[17]Because Levin also seeks prospective relief in the form of reinstatement, the official capacity claim against Madigan, which is treated like a claim against the state, remains in the case. The State of Illinois and the OIAG, however, are dismissed because they are not suable "persons" as that term is used in § 1983, *Will v. Michigan Dept' of State Police*, 491 U.S. 58, 70-71 (1989), and because of the Eleventh Amendment bar, *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). *See also Leavell v. Ill. Dep't of Resources*, 600 F.3d 798, 808 n.6 (7th Cir. 2010).

## V.

For the reasons stated above, Defendants' motions for summary judgment [R. 178, 191] are granted as to Counts 1 and 2, and denied as to Counts 3 and 4 against the Office of the Illinois Attorney General, Ann Spillane, Alan Rosen, Roger Flahaven, and Deborah Hagan. Additionally, summary judgment is granted in favor of Attorney General Madigan in her individual capacity.

The Court again emphasizes that summary judgment determinations are made by viewing the evidence in the light most favorable to the non-movant, here Levin, and by taking all reasonable inferences in his favor. The jury might well find otherwise at a trial where the evidence is not automatically viewed in Levin's favor and where Levin bears the burden of proof.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: July 12, 2011